UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

_____

In re:

      Eric C. Bennett and LeeAnne T. Bennett,     Chapter 13
                                  Case No. 19-60122
                        Debtors.

_____

In re:

      Eric M. Alsheimer,     Chapter 13
                                  Case No. 19-60171
                        Debtor.

_____

In re:

      Hailee N. Marshall,     Chapter 13
                                  Case No. 19-60173
                        Debtor.

_____

In re:

      Suzanne Diiorio,     Chapter 13
                                  Case No. 19-60271
                        Debtor.

_____

In re:

      Wayne R. Criddle and Sarah A. Criddle,     Chapter 13
                                  Case No. 19-60409
                        Debtors.

_____

In re:

      Amanda L. Piersma,     Chapter 13
                                  Case No. 19-60569
                        Debtor.

_____

*Appearances*

Mark W. Swimelar, Esq.
Standing Chapter 13 Trustee
250 South Clinton Street
Suite 203
Syracuse, New York 13202

Harris Courage & Grady PLLC                                          *Jessica G. Grady, Esq.*
*Attorneys for Debtors*
225 Greenfield Parkway, Suite 107
Liverpool, New York 13088

Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION

### I.    *Introduction*

America is barreling toward a student loan crisis. From politicians and journalists, to scholars, and judges, and even to celebrities, it seems almost everyone is in agreement that educational debt is out of control.

The widespread concern over this issue is easy to understand. At present, Americans owe more than 1.5 trillion dollars in student loan debt – an amount that has tripled in the last decade and now exceeds both automotive and credit card debt. Despite the troubling increase, there is an even more pressing issue: the low repayment rate. Only sixty percent of student loans are in active repayment, and a full eleven percent are in default. All told, these bleak statistics make it impossible to deny that educational debt is a significant problem in the United States. Disagreement arises, however, over the potential remedies.

Jason Iuliano, *Student Loan Bankruptcy and the Meaning of Educational Benefit*, 93 Am. Bankr.

L.J. 277, 277–279 (2019) (footnotes and citations omitted) (examining the statutory criteria for

dischargeability of student loans and challenging the prevailing view of the restrictions that prevent

courts from discharging student loans); *see also* Seth Frotman, *Broken Promises: How Debt-*

*financed Higher Education Rewrote America's Social Contract and Fueled a Quiet Crisis*, 2018

Utah L. Rev. 811 (2018) (hereinafter Frotman, *Broken Promises*) (concluding that America is

already experiencing a student loan crisis that has shifted a cross-generational burden onto the backs of students, families, and communities).

"At the same time that discharging student loans has become more difficult, an enormous expansion in the amount of student loan debt has presented bankruptcy lawyers and judges with individual debtors who are genuinely unable to repay the full amount of their education debt." Susan E. Hauser, *First Glance, Problems in the Code I, Separate Classification of Student Loan Debt in Chapter 13: An Examination of the Conflict Between 1322(b)(1) and (5)*, 32-3 ABIJ 38, 38 (Apr. 2013) (footnote and citation omitted) (hereinafter Hauser, *First Glance*) (referencing a series of congressional amendments to 11 U.S.C. § 523(a)(8) that parallel the development of the modern student loan industry, culminating with the 2005 extension of nondischargeability to student loans made by private lenders).[1] "The tension between the restrictive language of the Bankruptcy Code and the reality of their caseloads has created pressure on both judges and lawyers to push the law in new directions to allow relief to overburdened debtors." *Id.* One such solution is for individual chapter 13 debtors to utilize the provisions of chapter 13 to treat student loan debt more advantageously than other unsecured debt. *Id.*

Now, this Court finds itself thrust into the longstanding national debate about how far the bankruptcy system may go to alleviate the mounting burden on debtors shouldering significant student loan debt. Specifically, the Court is asked to determine whether chapter 13 debtors may separately classify and favorably treat student loan claims within chapter 13 repayment plans and, if so, when and how? For decades, courts have struggled with these questions and reached inconsistent results.

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

For many years, the status quo in the United States Bankruptcy Court for the Northern District of New York has been to disallow preferential treatment to student loan claims. *See, e.g., In re Goewey*, 185 B.R. 444 (Bankr. N.D.N.Y. 1995) (indicating that separate classification may be permissible because Congress did not expressly prohibit it, but finding "little justification for the disparate treatment of unsecured creditors except to, in effect, force the other unsecured creditors to finance Debtors' education"). For good reason, Attorney Grady and the Standing Chapter 13 Trustee (the "Trustee") ask the Court to change course and to not only allow the separate classification of student loan claims in chapter 13 plans, but to also adopt a presumptively permissible standard for fair discrimination in favor of student loan claims. After careful consideration of the issue and in the absence of binding precedent from the United States Court of Appeals for the Second Circuit, the Court adopts the framework and test espoused by the First Circuit Bankruptcy Appellate Panel in *Bentley v. Boyajian (In re Bentley)*, 266 B.R. 229 (B.A.P. 1st Cir. 2001).

## II.    Jurisdiction

The Court has jurisdiction to hear and determine these matters pursuant to 28 U.S.C. §§ 157(a) and (b)(1) and 1334(a) and (b). These matters are core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(L). The statutory predicates for the relief sought by Debtors and the Trustee are §§ 1322(b)(1) and 1325(b)(1)(B). The pertinent facts are uncontested. Accordingly, these matters are submitted to the Court on oral argument and briefs. Based thereon, the Court issues the following findings of fact and conclusions of law pursuant to Rule 7052.

## III.    Facts[2]

## A.    Above-Median Income Debtors

---

[2] Unless otherwise indicated, the docket numbers cited in this section correspond to the docket numbers of each case.

1.      *Eric M. Alsheimer*

Eric M. Alsheimer ("Alsheimer") filed a chapter 13 case on February 13, 2019, as an above-median income debtor. He filed an amended plan that proposes to pay the Trustee $2,175.00 per month for 60 months. (ECF No. 22). His monthly disposable income under § 1325(b)(3), as calculated on Official Form 122-C-2, Line 45, is $1,887.15. His projected disposable income is $113,229.00. He owes $180,687.74 in federal student loans and $29,635.74 in private student loans, for a total of $210,323.48. Unsecured claims in the case, including the student loan claims, total $277,523.46.[3] Alsheimer proposes to maintain contractual monthly payments in the amount of $242.00 on the private student loan owed to Mohela, as evidenced by Proof of Claim Number 1. Per the parties, Alsheimer will pay approximately $114,407.00 to all unsecured creditors.

If Alsheimer is permitted to separately pay Mohela as proposed, Mohela will receive a dividend of 49% (not including interest), while the federal student loan and other general unsecured creditors will receive a dividend of 40.29%. By comparison, paying Mohela *pro rata* with other unsecured creditors would yield all unsecured creditors a dividend of 41.22%. Thus, the difference between classes if discrimination is allowed is 8.71%, and the difference between discrimination and no discrimination is less than 1%, or 0.93% to be precise. No party has objected to the amended plan and the Trustee recommends confirmation in this case.

2.      *Eric C. and LeeAnne T. Bennett*

Eric C. and LeeAnne T. Bennett (the "Bennetts") filed a chapter 13 case on January 30, 2019, as above-median income debtors. They filed an amended plan that proposes to pay the Trustee $800.00 for 60 months. (ECF No. 25.) Their monthly disposable income under § 1325(b)(3), as calculated on Official Form 122-C-2, Line 45, is $638.18. Their projected disposable income is

---

[3] The Court derived the claim information and totals from the Official Claims Register in each case. The bar date set in each case has passed.

$38,290.80. They owe $13,882.42 in federal student loans, as evidenced by Proof of Claim Number 23 filed by Navient Solutions, LLC ("Navient") on behalf of the United States Department of Education. Unsecured claims in the case, including the student loan claim, total $59,959.82. The Bennetts propose to maintain contractual monthly payments in the amount of $182.00 on the federal student loan to Navient. The Bennetts will pay approximately $39,506.41to all unsecured creditors.

Navient will receive a dividend of 78.63% (not including interest), while other general unsecured creditors will receive a dividend of 62.04%, if the Bennetts are permitted to separately pay Navient as proposed. By comparison, paying Navient *pro rata* with other unsecured creditors would yield all unsecured creditors a dividend of 65.89%. Thus, the difference between classes if discrimination is allowed is 16.59%, and the difference between discrimination and no discrimination is 3.85%. The Bennetts also propose that any future tax refunds paid into the plan be directed to payment of the student loan claim.[4] They have stipulated to the Trustee's reservation of his right to object to unfair discrimination in the event that the student loan claim would receive a dividend 20% or greater than that received by other unsecured creditors. No party has objected to the amended plan and the Trustee recommends confirmation in this case.

3.    *Wayne R. and Sarah A. Criddle*

Wayne R. and Sarah A. Criddle (the "Criddles") filed a chapter 13 case on March 29, 2019, as above-median income debtors. They filed an amended plan that proposes to pay the Trustee $1,551.14 for 5 months and $1,650.00 for 55 months, for a total of 60 months. (ECF No. 22.) Their monthly disposable income under § 1325(b)(3), as calculated on Official Form 122-C-2, Line 45, is $642.26. Their projected disposable income is $38,535.60. They owe $5,216.95 in federal student loans, as evidenced by Proof of Claim Number 10 filed by the United States Department of

---

[4] Part 2, Paragraph 2.3 of the Local Chapter 13 Plan for the Northern District of New York requires debtors to turn over to the Trustee all income tax refunds in excess of $1,500.00 received during the plan term.

Education. Unsecured claims in the case, including the student loan claim, total $20,692.32. The Criddles propose to pay the student loan claim 100% plus 6.5% interest, and to pay other unsecured creditors 100%.

The Criddles also propose that any future tax refunds paid into the plan be directed to the payment of the student loan claim. They have stipulated to the Trustee's reservation of his right to object to unfair discrimination in the event that the student loan claim would receive a dividend 20% or greater than that received by other unsecured creditors. No party has objected to confirmation and the Trustee recommends confirmation in this case.

B.      *Below-Median Income Debtors*

1.      *Suzanne Diiorio*

Suzanne Diiorio ("Diiorio") filed a chapter 13 case on March 6, 2019, as a below-median income debtor. Thus, her disposable income is not controlled by the chapter 7 means test as incorporated by § 1325(b)(3). She filed a plan that proposes to pay the Trustee $125.00 per month for 36 months. (ECF No. 2.) Diiorio's Amended Schedule J reports monthly net income in the amount of $110.68. She owes $12,823.16 in federal student loans, as evidenced by Proof of Claim Number 10 filed by the United States Department of Education. Unsecured claims in the case, including the student loans claim, total $30,969.70. Per the parties, Diiorio will pay approximately $1,057.00 to all unsecured creditors.

In accordance with local practice and custom, Diiorio has agreed to increase the dividend to general unsecured creditors from 0.03% to 1%. However, Diiorio proposes that any future tax refunds paid into the plan be directed to payment of the student loan claim. Diiorio has stipulated to the Trustee's reservation of his right to object to unfair discrimination in the event that the student loan claim would receive a dividend 20% or greater than that received by other unsecured

creditors. Based on the fact that Diiorio's 2018 tax refunds totaled $1,410.00, the parties believe that discrimination will be unlikely. No party has objected to confirmation and the Trustee recommends confirmation in this case.

2.      *Hailee N. Marshall*

Hailee N. Marshall ("Marshall") filed a chapter 13 case on February 13, 2019, as a below-median income debtor. Thus, her disposable income is not controlled by the chapter 7 means test as incorporated by § 1325(b)(3). She filed an amended plan that proposes to pay the Trustee $190.00 for 36 months. (ECF No. 19.) Marshall's Schedule J reports monthly net income in the amount of $189.84. She owes $2,944.30 in federal student loans, as evidenced by Proof of Claim Number 11 filed by the United States Department of Education. Unsecured claims in the case, including the student loan claim, total $39,941.36. Marshall proposes to maintain contractual monthly payments in the amount of $31.57 on the federal student loan to the United States Department of Education. Marshall proposes to pay $3,113.00 to all unsecured creditors.

The Department of Education will receive a dividend of 38.6% (not including interest), while other general unsecured creditors will receive a dividend of 5.34%, if Marshall is permitted to separately pay the United States Department of Education. By comparison, paying the United States Department of Education *pro rata* with other unsecured creditors would yield all unsecured creditors a dividend of 7.79%. Thus, the difference between classes if discrimination is allowed is 33.26%, and the difference between discrimination and no discrimination is 2.45%. Marshall also proposes that any future tax refunds paid into the plan be directed to payment of the student loan claim. She has stipulated to the Trustee's reservation of his right to object to unfair discrimination in the event that the student loan claim would receive a dividend 20% or greater than that received by other unsecured creditors.

The Trustee initially objected to confirmation and recommended denial of confirmation of the plan in this case on the basis that a 33.26% swing "discriminates unfairly" against separately classified general unsecured creditors in violation of § 1322(b)(1).[5] However, the Trustee subsequently withdrew his objection and recommended confirmation in this case.[6]

3.    *Amanda L. Piersma*

Amanda L. Piersma ("Piersma") filed a chapter 13 case on April 24, 2019, as a below-median income debtor. Thus, her disposable income is not controlled by the chapter 7 means test as incorporated by § 1325(b)(3). She filed a plan that proposes to pay the Trustee $287.00 per month for 60 months. (ECF No. 2.) Piersma's Schedule J reports monthly income in the amount of $282.16. She owes $24,424.72 in federal student loans, as evidenced by Proof of Claim Number 2 filed by the United States Department of Education/Mohela. Unsecured claims in the case, including the student loan claim, total $25,360.19. Per the parties, Piersma proposes to pay $667.50 to all unsecured creditors.

Piersma proposes to pay a 2.6% dividend to the United States Department of Education/Mohela, while other general unsecured claims will receive a dividend of 1%. By comparison, if they were paid *pro rata*, all unsecured creditors would be paid a dividend of approximately 2.63%. Piersma also proposes that any future tax refunds paid into the plan be directed to payment of the student loan claim. Piersma has stipulated to the Trustee's reservation of his right to object to unfair discrimination in the event that the student loan claim would receive a dividend 20% or greater than that received by other unsecured creditors. Based on the fact that

---

[5] The Trustee's initial objection and recommendation regarding the original plan were contained in his Memorandum of Law filed in the *Alsheimer* case. (Chapter 13 Case No. 19-60171, ECF No. 21.)
[6] The Trustee's revised position regarding the amended plan is contained in his Supplemental Letter Brief filed in the *Alsheimer* case. (Chapter 13 Case No. 19-60171, ECF No. 26.)

Piersma's 2018 tax refunds totaled $1,120.00, the parties believe discrimination will be unlikely.

No party has objected to confirmation and the Trustee recommends confirmation in this case.

IV.    *Procedural History*

The Court consolidated the plan confirmation hearings in these cases in order to decide

whether Debtors could utilize § 1322(b)(1) to separately classify and discriminate in favor of their

student loan claims and, if so, when and how may they do so? In only one case, the Trustee objected

to plan confirmation. In the others, where no objections were filed by either creditors or the

Trustee, the Court raised the issue given its independent obligation to determine whether a plan

fulfills the requirements for confirmation under chapter 13. *United Student Aid Funds, Inc. v.*

*Espinosa*, 559 U.S. 260, 277 n.15 (2010). Notwithstanding the Trustee's withdrawal of his

objection in the *Marshall* case, or the fact that all matters are presently unopposed, the Court took

the matters under advisement on October 22, 2019.

V.    *Discussion*

A.    *Burden*

Debtors, as the proponents of the chapter 13 plans at issue, bear the burden of proof to

show that their respective chapter 13 plan meets the requirements for confirmation set forth in §

1325(a). *In re Kane*, 603 B.R. 491, 493–94 n.8 (Bankr. D. Kan. 2019) (citing *Alexander v.*

*Hardeman (In re Alexander)*, 363 B.R. 917, 921–22 (B.A.P. 10th Cir. 2007)).

B.    *Applicable Law*

The relevant Bankruptcy Code provision relied upon by Debtors and the Trustee is §

1322(b)(1), which provides that a chapter 13 plan may "designate a class or classes of unsecured

creditors, as provided in section 1122 of this title, but may not *discriminate unfairly* against any

class so designated . . . ." 11 U.S.C. § 1122(b)(1) (emphasis added).[7] "According to its plain

language, § 1322(b)(1) permits a plan to divide unsecured claims into different classes and even

tolerates discrimination (in a nonpejorative sense of the word) amongst classes of unsecured

claims, provided that the plan does not discriminate 'unfairly.'" *In re Orawsky*, 387 B.R. 128, 139

(citing *In re Leser*, 939 F.2d 669, 671–72 (8th Cir. 1991)). Because the Bankruptcy Code does not

define the phrase "discriminate unfairly," the Court has broad discretion to make case-by-case

determinations as to whether a particular plan's proposed discrimination runs afoul of §

1322(b)(1). *Kane*, 603 B.R. at 494 (citing *In re Knowles*, 501 B.R. 409, 415 (Bankr. D. Kan.

2013)).

In the absence of a specific congressional directive, several courts and legal commentators

have turned to the legislative history for guidance. *Orawsky*, 387 B.R. at 140 (citing Stephen L.

Sepinuck, *Rethinking Unfair Discrimination in Chapter 13*, 74 Am. Bankr. L.J. 341, 347–49

---

[7] In addition, Attorney Grady references § 1322(b)(5) as additional justification for the separate classification of student loan claims in these cases and, where applicable, continuation by certain Debtors of their respective contractual monthly student loan payments while making *pro rata* payments to other unsecured creditors through the plan. "Pursuant to § 1322(b)(5), if the last payment on the student loan is due after the final payment under the plan is due, the plan may provide for the curing of the default and the maintenance of ongoing payments. This treatment can only be accomplished through separate classification of the student loan claim." *In re Williams*, 253 B.R. 220, 226 (Bankr. W.D. Tenn. 2000). "Because most student loans are long-term debts with payments that extend beyond the life of the plan, they fall within the subset of obligations governed by § 1322(b)(5)." Hauser, *First Glance*, 32-3 ABIJ at 38. Since § 1322(b)(5) provides preferential treatment to student loan creditors, a question arises as to whether this subsection trumps subsection (b)(1), thereby allowing the plan to cure defaults and maintain payments on student loans without regard for the position of other unsecured creditors. *Id.* at 39. "In struggling with how to best deal with the competing interests involved when nondischargeable student loans are in issue, . . . [a minority of] courts have foregone the section 1322(b)(1) unfair discrimination analysis entirely in favor of section 1322(b)(5)." *In re Sullivan*, 195 B.R. 649, 657 (Bankr. W.D. Tex. 1996). The majority of courts, however, have declined to find that § 1325(b)(5) provides an exception to § 1322(b)(1) for nondischargeable debts. *In re Simmons*, 288 B.R. 737, 749 (Bankr. N.D. Tex. 2003). Attorney Grady has not raised § 1322(b)(5) as an alternative basis for relief or argued for the inapplicability of the unfair discrimination rule codified in § 1322(b)(1). Nevertheless, the Court is compelled by the reference in the record to § 1322(b)(5) to clarify its position with respect to the same. The Court agrees that "the majority view adopts the best construction of the existing statute by reading subsection (b)(5) in light of (b)(1) and attempting to harmonize the conflict by imposing an unfair-discrimination analysis on chapter 13 plans that use § 1322(b)(5) to provide for full payment of student loan debts." Hauser, *First Glance*, 32-3 ABIJ at 39; *see also Simmons*, 288 B.R. at 748 (noting that Congress knows how to make exceptions to a statutory provision of general application, as it did when it excepted certain co-signed consumer debts from § 1322(b)(1)). For purposes of this decision, the Court will therefore focus on § 1322(b)(1) and the concept of what it means to "discriminate unfairly." 11 U.S.C. § 1322(b)(1).

(2000) (hereinafter Sepinuck, *Rethinking Unfair Discrimination*); Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 230–31 (1998); *In re Simmons*, 288 B.R. 737, 744–48 (Bankr. N.D. Tex. 2003)). What they concluded, however, is "that the concept of unfair discrimination was designed to maintain equity among creditors of equal priority." *Id.* at 141. Further, notwithstanding the inclusion of the unfair discrimination standard in both § 1129(b) and § 1322(b), most courts have correctly ignored chapter 11 case law when undertaking this analysis in the chapter 13 context. They have done so for a myriad of reasons, including that chapter 13 should be more lenient than chapter 11 and individual debtors in chapter 13 should thus be given more flexibility than chapter 11 businesses in devising their plans. *In re Engen*, 561 B.R. 523, 534–35 (Bankr. D. Kan. 2016) (comparing and contrasting the confirmation processes in chapter 11 and chapter 13 and other differences between the chapters); *see also* Sepinuck, *Rethinking Unfair Discrimination*, 74 Am. Bankr. L.J. at 348–51.

For more than twenty years, as courts have attempted to find a feasible, practical, reasoned approach to § 1322(b)(1), "an array of different tests have been articulated, critiqued, rejected and re-formulated . . . ." *Orawsky*, 387 B.R. at 141. The *Orawsky* court undertook "an exhaustive analysis of the various tests which have been developed by the courts to determine whether a plan discriminates unfairly," *In re Pracht*, 464 B.R. 486, 490–91 (Bankr. M.D. Ga. 2012), before selecting and applying *Bentley* to its particular facts, *Orawsky*, 387 B.R. at 148.

 The majority of courts that have grappled with the question of when discrimination is unfair in chapter 13 have applied some form of multi-factor test. *Id.* at 141. The Eighth Circuit Court of Appeals articulated the most widely-applied test in a case involving preferential treatment of child support payments. *Leser*, 939 F.2d at 672 (citing *In re Wolff*, 22 B.R. 410 (B.A.P. 9th Cir. 1982)). Under what is now known as the *Leser/Wolff* test, a court must consider whether: (1) the

discrimination has a reasonable basis; (2) the debtor can carry out a plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of discrimination is directly related to the basis or rationale for the discrimination. *Leser*, 939 F.2d at 672 (citations omitted); *Wolff*, 22 B.R. at 512. While the *Leser/Wolff* test has been repeatedly applied, it has also been frequently criticized for being too subjective.

A few courts that favor a multi-factor approach have attempted to fix the perceived flaws in the *Leser/Wolff* test by incorporating additional factors. *Orawsky*, 387 B.R. at 142 (citing *In re Husted*, 142 B.R. 72 (Bankr. W.D.N.Y. 1992) (adding a fifth factor, namely "the difference between what the creditors discriminated against will receive as the plan is proposed, and the amount they would receive if there was no separate classification"); *In re Bird*, 1994 Bankr. LEXIS 2384 (Bankr. D. Idaho Dec. 23, 1994) (adding three additional factors)). Other courts have simply abandoned the multi-factor test and instead employed a "legitimate interests of the debtor" test, *id.* at 143 (citing *In re Lawson*, 93 B.R. 979, 984 (Bankr. N.D. Ill. 1988) (rendering discrimination fair "to the extent it rationally furthers an articulated, legitimate interest of the debtor")), or a "correlative benefit to the creditor" test, *id.* (citing *McCullough v. Brown (In re Brown)*, 162 B.R. 506 (N.D. Ill. 1993), rev'g 152 B.R. 232 (Bankr. N.D. Ill. 1993)).

As the *Orawsky* court acknowledged, several other tests and hybrids have been developed and applied with varied results. *Id.* at 143; *see also* Sepinuck, *Rethinking Unfair Discrimination*, 74 Am. Bankr. L.J. at 351 n.48 ("The precise number varies depending on how one categorizes what courts have done."). While the courts employ various tests, they all strive to reconcile the permissive nature of § 1322(b)(1) with certain fundamental bankruptcy policies and principles. *Id.* at 145. Courts routinely reference Bankruptcy Code provisions related to the "fresh start," equal treatment of creditors and the strict prioritization of claims, nondischargeability and placement of

the burden of repayment for educational debt on debtors, and the absence of express, statutory priority for education loans. *Id.* at 145–46. For every legitimate concern, however, there are responses that merit consideration. *Id.* at 146. For example, "while it is true that Congress did not make student loan obligations priority debts as it did with child support payments, . . . there are many reasons why Congress might have done so [including the equal application of priorities in chapter 7 and the requirement that priority claims be paid in full in chapter 13] that have no bearing on whether a debtor should be permitted to give them favored treatment in a Chapter 13 plan." *Id.* at 146 n.30.

It seems that uncertainty is the only certainty that has developed in the extensive body of case law on this topic. While the Trustee recognizes that a comparison approach is the best solution, in the interest of judicial economy, he has adopted and recommends a policy of allowing preferential treatment and discrimination in favor of student loan claims provided that the discrimination is no more than 20%. In furtherance of his affirmative statutory duty to review and object to each plan that does not meet the requirements for confirmation, the Trustee requests that the Court approve this threshold test. The Trustee contends that this would provide chapter 13 debtors and their counsel in this District with much-needed flexibility. He also contends that it is both reasonable and simple to administer.

As a practical matter, if the Court agrees, the Trustee would not be obligated to object to a plan incorporating a distribution scheme that results in a disparity of treatment or so-called "swing" of more than 20%, meaning that the unsecured creditors will not receive more than 20% less than they would have received in the absence of the proposed discrimination. *Sullivan*, 195 B.R. at 656. Notwithstanding his endorsement of a percentage policy, the Trustee recognizes that there may be cases where the 20% rule would trigger a finding of unfair discrimination, but the actual effect on

the general unsecured creditors would be so de minimis as to support an exception. As an example, the Trustee points to the *Marshall* case presently under consideration where the actual funds at issue total $924.94, which would be distributed to 9 claimants over 36 months.

At least one court has taken this approach and adopted a slightly more liberal rule, indicating that it would declare a 30% swing to be fair and require debtors to show "unique circumstances to support a greater degree of discrimination." *Williams*, 253 B.R. at 231. Other courts, when asked to do the same, have declined. *See, e.g., Brown*, 162 B.R. at 516 (the court "cheerfully reject[ed] any temptation to formulate a universal standard by which to measure all future class-discriminatory plans"). The *Brown* court, in reversing and remanding the bankruptcy court's orders of confirmation in several cases, noted:

> Congress' use of the phrase "discriminate unfairly against any class" of unsecured claims, without so much as a hint as to the criteria by which to test the "unfairly" concept, tells us that Orwell's *Animal Farm* is at work here (some discriminations are more equal–or rather more unequal–than others), but it offers no clue to a principled definition by which to judge all plans that debtors may seek to devise, to see which of them may discriminate "fairly" rather than "unfairly."

*Id.* The *Brown* court ultimately declined to endorse a particular test but cautioned that "[i]f a plan affording such preferential treatment is to survive scrutiny under the statutory 'discriminate unfairly' test, the debtor must place something material onto the scales to show a correlative benefit to the other unsecured creditors . . . ." *Id.* at 518.

Attorney Grady supports the Trustee's approach, with the caveat that the 20% rule should be applied to measure both the degree of discrimination between separate classes and the degree of discrimination against *pro rata* treatment. Attorney Grady advocates for a uniform rule in order to ensure that chapter 13 debtors in this District receive equal treatment and equal application of the law.

As one court recently noted, however, even a "bright line rule" will not guarantee the result Attorney Grady seeks. *See In re Kindle*, 580 B.R. 443, 452 (Bankr. D.S.C. 2017) ("[U]sing a percentage to determine what constitutes unfair discrimination would not be proper. In some cases, even a five percent difference between the amounts a student loan creditor and other general unsecured creditors are receiving could be large. However, in other cases, . . . a ten percent difference may be much less significant."). As pointed out by the Trustee, the *Marshall* case exemplifies this shortfall perfectly.

## C.    Analysis

After analyzing the different tests that have evolved when considering whether placing student loans into a separate class from general unsecured creditors is unfair discrimination in violation of § 1322(b)(1), the Court follows *Bentley* and joins those courts that have adopted its so-called "baseline" test.

In *Bentley*, the Bankruptcy Appellate Panel for the First Circuit began its discussion of unfair discrimination with an examination of the fundamental concepts of nondischargeability and prioritization of debts. Specifically, it noted that:

> . . . Nothing in the Bankruptcy Code requires that a nondischargeable debt, as such, be paid in full through a Chapter 13 plan. Rather, the only consequence of nondischargeability is that, to the extent the debt is not paid through the Chapter 13 plan, it must be paid after completion of the plan, or at least from a source other than the funds devoted to the plan. . . .

> With respect to those nondischargeable obligations that also happen to be priority debts, the Bankruptcy Code requires that a Chapter 13 plan provide for exactly that treatment. This is because § 1322(a)(2) of the Code requires, as a condition of confirmation, that the plan provide for full payment of all claims entitled to priority. 11 U.S.C. § 1322(a)(2). But nondischargeability is not the same as priority. Priority gives a claim a better right to estate assets or plan payments– *i.e.,* to the funds distributed through bankruptcy–than is enjoyed by other unsecured claims. Nondischargeability, on the other hand, confers no priority as to estate assets; it merely causes a debt to survive discharge, such that its holder can continue to collect despite the discharge. Certain nondischargeable debts also happen to be

> priority claims, but only because the same debts appear on two lists: thus, in
> Chapter 13, spousal and child support obligations appear both on the list of priority
> claims, at 11 U.S.C. § 507(a)(7), and on the list of debts excepted from discharge,
> at 11 U.S.C. § 523(a)(5) and 1328(a)(2). But, priority does not *per se* confer or
> entail nondishargeability; and nondischargeability does not *per se* confer or entail
> priority.

*Bentley*, 266 B.R. at 235–36. The *Bentley* court continued to state that the student loan obligations

of the kind set forth in § 523(a)(8) are not priority claims. *Id.* at 236. "Though the [Bankruptcy]

Code excepts debts of this kind from discharge in Chapter 13, the Code neither grants them priority

over other unsecured claims nor requires that they be paid in full." *Id.* n.8 (citing 11 U.S.C. §

1328(a)(2)). Therefore, as the *Bentley* court phrased it, the question becomes "may debtors

nonetheless structure their Chapter 13 plans to prefer these debts over other unsecured debts, to

provide that they be paid in full [or in a greater amount] while other unsecureds get less or nothing

at all?" *Id.* Bankruptcy Code § 1322(b)(1) answers the first part of the question affirmatively, but

it does not answer the second part and instead states only that the plan "may not discriminate

unfairly against any class so designated." *Id.* (citing 11 U.S.C. § 1322(b)(1)).

The *Bentley* court rejected an iteration of the *Leser/Wolff* test and any test that focused on

the debtor's interest in determining whether the discrimination was fair. *Id.* at 239. The *Bentley*

court declared that "[t]he fairness of a discriminatory provision depends on the nature of the

discrimination and the circumstances in which it is proposed." *Id.* at 234. Because § 1322(b)(1)

asks whether the plan provision is "fair," rather than whether it is "prudent," the *Bentley* court

reasoned that courts must consider the competing interests of all affected parties as opposed to

only the interest of the debtor. *Id.* at 239. Hence, the *Bentley* court explained that courts should

look to chapter 13 itself for what is "normative," and allow that to serve as the "baseline from

which departures can be discerned, measured, and evaluated for fairness." *Id.* n.18 (citing *In re*

*Collier*, 159 B.R. 602, 608–11 (Bankr. D. Me. 1993); *Brown*, 162 B.R. at 515–18)).

Under this approach, the core principles and policies of chapter 13 provide a "baseline" for courts to evaluate discriminatory provisions for fairness. "When a plan prescribes different treatment for two classes but, despite the differences, offers to each class the benefits and burdens that are equivalent to those it would receive at the baseline, then the discrimination is fair." *Id.* at 240. But "when the discrimination alters the allocation of benefits and burdens to the detriment of one class, the discrimination is unfair and prohibited." *Id.* The *Orawsky* court summarized the four baselines identified by *Bentley* as follows:

1. ***Equality of distribution*** reflects the general expectation that, absent an express grant of priority, unsecured creditors will share equally in any dividend. As a result of this principle, 'fairness in Chapter 13 requires equality of distribution among nonpriority unsecured creditors, and the burden of justification is on those who propose plans to the contrary.'

2. ***Nonpriority of student loans*** incorporates the notion that the [Bankruptcy] Code does not grant student loans priority status. The baseline expectation here is simply that nothing in the [Bankruptcy] Code mandates treating student loans more favorably than general unsecured claims.

3. ***Contributions: mandatory v. optional*** expresses the chapter 13 requirement that a debtor devote all of his or her projected disposable income to a plan if the plan does not pay the full amount allowed unsecured claims. The expectation emanating from that requirement is that unsecured creditors would share *pro rata* from distributions funded with the debtor's *mandatory contributions*.

4. ***A fresh start for honest debtors*** is one of the Bankruptcy Code's fundamental purposes. This baseline is tempered against the notion that Chapter 13 does not contemplate that debtors 'will necessarily emerge from Chapter 13 entirely free of student loan obligations.'

*Orawsky*, 387 B.R. at 147–48 (citing and quoting *Bentley*, 266 B.R. at 240–42) (emphasis in original). It then indicated that it found the *Bentley* baseline test to be useful not only because it relied upon underlying bankruptcy policies and principles to guide the court's determination of fairness, but also because it included "both a qualitative and quantitative component" and a "balancing of competing interests." *Id.* at 148.

Other bankruptcy courts have made similar observations, stating that the test is:

> . . . essentially objective and measurable in that it . . . require[s] courts to determine[:] (1) whether the preferred debt is accorded statutory priority; (2) whether the unsecured creditors would receive at least as much as they would receive without the debt being preferred; (3) whether the unsecured creditors would receive a fair pro rata share of the debtor's mandatory contribution of disposable income (and, if not, whether the debtor has agreed to make an additional contribution to 'square up' the unsecured creditors' distribution); and [4] whether the preferential treatment of one creditor somehow furthers the debtor's fresh start.

*In re Mason*, 300 B.R. 379, 387 (Bankr. D. Kan. 2003).

The Court agrees that the *Bentley* baseline test is the most consistent with the statutory scheme of chapter 13 and the spirit of the Bankruptcy Code. *Knowles*, 501 B.R. at 417; *see also Mason*, 300 B.R. at 387 ("The baseline test appeals to this Court as objective and fairly easy to implement. It is in accord with the statutory scheme of priority established by the Code and prevents the courts from legislating priorities as these debtors would have the Court do today.").

Further, *Bentley* has not been rendered "obsolete" and is still good law notwithstanding the enactment of the Bankruptcy Abuse and Consumer Protection Act of 20015 ("BAPCPA"). *In re Stull*, 489 B.R. 217, 221 (Bankr. D. Kan. 2013); *In re Sharp*, 415 B.R. 803, 809 (Bankr. D. Colo. 2009) ("The passage of BAPCPA did not alter the language of § 1322(b)(1) or § 1322(b)(5), giving pre-BAPCPA cases continued relevance."); *but see Engen*, 561 B.R. at 545 ("Much has changed [as student loan debt as tripled over the past decade]. . . since the *Bentley* Baseline test was adopted; it is appropriate to look beyond the confines of that test.").

D.    *Application of Bentley to Debtors' Cases*

Courts that have followed *Bentley* have placed particular emphasis on the principle of equality of distribution and the statutory requirement set forth in § 1325(b)(1)(B) for the plan to provide "that all of the debtor's projected disposable income to be received in the applicable commitment period . . . be applied to make payments to unsecured creditors under the plan," 11

U.S.C. § 1325(b)(1)(B). *See, e.g., In re Osorio*, 522 B.R. 70, 81–82 (Bankr. D.N.J. 2014) (discussing the interplay between § 1322(b)(1) and §1325(b)(1)(B)). Certain instructions have emerged from these cases, mainly in relation to the third baseline concerning mandatory versus optional contributions, which is most often decisive.

Because student loans are not accorded priority status under § 507(a), "anything they receive over what they would take in a pro rata distribution without the discrimination, should come from assets not required to be contributed to the plan and thus not detract from the unsecured creditors' take." *Stull*, 489 B.R. at 220 n.17 (citing *Bentley*, 266 B.R. at 243); *accord Knowles*, 501 B.R. at 419–20 (overruling the trustee's objection under § 1322(b)(1) because the debtor's plan proposed to use discretionary income, above the Code-computed mandatory projected disposable income, to voluntarily contribute to payment of student loans). "Otherwise, the unsecured creditors would bear the burden of paying the nondischargeable claim." *Id.*

Accordingly, to the extent that debtors have excess or discretionary income beyond their projected disposable income as determined via the methodology required by either 11 U.S.C. § 1325(b)(2) or (3), *Bentley* permits them to utilize those funds during the applicable commitment period to make additional voluntary payments to student loan creditors. *Salazar*, 543 B.R. at 674 (citing *Stull*, 489 B.R. at 222 n.24) (an above-median debtor can have discretionary income because his or her actual monthly income exceeds his or her historical current monthly income; a below-median debtor can only have discretionary income if his or her actual monthly income is greater than the historical current monthly income the Bankruptcy Code requires to use to determine a chapter 13 debtor's projected disposable income). Further, to the extent that debtors are able and wish to continue payments after the expiration of the applicable commitment period, *see* 11 U.S.C. § 1322(d)(2) (permitting a longer plan term for below-median income debtors "for

cause"), such discrimination would not offend the concept of fairness under § 1322(b)(1) and is therefore permissible, *Osorio*, 522 B.R. at 82. In the latter instance, "[b]ecause the debtor would no longer be required to pay his or her other creditors after the expiration of the applicable commitment period, such discrimination by its very nature could not be unfair. All that would be required of such discrimination is that it be reasonable." *Id.* (citing *In re Alicea*, 199 B.R. 862 (Bankr. D.N.J. 1996)).

As it must, the Court turns its attention to the cases and matters before it, to determine whether Debtors' respective plans pass the *Bentley* baseline test that now governs chapter 13 cases filed in the Utica Division.

## 1.    *Eric M. Alsheimer*

Analyzing the facts of this case, the Court finds the following: (1) the proposed amended plan fails to evenly allocate the mandatory contribution of projected disposable income, and Alsheimer has not proposed to "square up" the disproportionate contribution, although it would seemingly be easy to do given that it is less than 1%; (2) it is undisputed that Congress has not provided student loans with statutory priority under the Bankruptcy Code; (3) the calculations reflect that the unsecured creditors will receive under the proposed amended plan a 40.29% distribution, whereas if no discrimination existed, they would receive a 41.22% distribution; and (4) Alsheimer's fresh start likely will not be furthered by the proposed preferential treatment given that a significant amount of his student loan debt will still survive post-bankruptcy. Accordingly, Alsheimer has failed to meet his burden and the proposed amended plan may not be confirmed.

## 2.    *Eric C. and LeeAnne T. Bennett*

Analyzing the facts of this case, the Court finds the following: (1) the proposed amended plan fails to evenly allocate the mandatory contribution of projected disposable income, and the

Bennetts have not proposed to "square up" the disproportionate contribution, although they may be able do so given that is 3.85%; (2) it is undisputed that Congress has not provided student loans with statutory priority under the Bankruptcy Code; (3) the calculations reflect that the unsecured creditors will receive under the proposed amended plan a 62.04% distribution, whereas if no discrimination existed, they would receive a 65.89% distribution; and (4) the Bennett's fresh start likely will not be furthered by the proposed preferential treatment given that approximately one-third of their student loan debt will still survive post-bankruptcy. Accordingly, the Bennetts have failed to meet their burden and the proposed amended plan may not be confirmed.

3.    *Wayne R. and Sarah A. Criddle*

Preliminarily, the Court notes that the Criddles are the only Debtors contributing discretionary income above the mandatory contributions to pay all unsecured creditors, including the student loan creditor, in full. Analyzing the facts of this case, the Court finds the following: (1) the proposed amended plan does evenly allocate the mandatory contribution of projected disposable income; (2) it is undisputed that Congress has not provided student loans with statutory priority under the Bankruptcy Code; (3) the calculations reflect that the unsecured creditors will receive under the proposed amended plan a 100% distribution, whereas the student loan creditor will receive a 100% distribution plus the payment of interest at 6.5%; (4) the payment of post-petition interest on the student loan claim is allowable under § 1322(b)(10) because the proposed amended plan provides for full payment of all allowed claims, *see* 8 Collier on Bankruptcy ¶ 1322.14 (16th ed. 2019); *see also Stull*, 489 B.R. at 223 ("[I]n the absence of 'full payment of all allowed claims, an unsecured nondischargeable claim may not receive interest.'"); and (5) the Criddles fresh start will be furthered by the proposed treatment since the student loan claim is

nondischargeable and would otherwise accrue interest. Accordingly, the Criddles have met their burden and the proposed amended plan may be confirmed.

4.    *Suzanne Diiorio*

Analyzing the facts of this case, the Court finds the following: (1) the proposed plan evenly allocates the mandatory contribution of projected disposable income at present, and based on historical data provided, will likely continue to do so during the applicable commitment period; (2) it is undisputed that Congress has not provided student loans with statutory priority under the Bankruptcy Code; (3) the calculations reflect that the student loan and other unsecured creditors will receive under the proposed plan a 1% distribution; and (4) the impact on Diiorio's fresh start is neutral, as it is neither furthered nor hindered by the proposed treatment. Accordingly, Diiorio has met her burden and the proposed plan may be confirmed.

5.    *Hailee N. Marshall*

Preliminarily, the Court recognizes that due to the amount of funds involved in this case, the actual effect of the proposed discrimination on the general unsecured creditors would be de minimis. However, the fact that they receive even a dime less than they would be entitled to under § 1325(b)(1)(B) "alters the benefits and burdens to the detriment of one class," in deviation of the baseline established by *Bentley*. *See Stull*, 489 B.R. at 221. Analyzing the facts of this case, the Court finds the following: (1) the proposed plan does not evenly allocate the mandatory contribution of projected disposable income, and Marshall has not proposed to "square up" the disproportionate contribution, and likely is unable to be able to do so given her below-median status; (2) it is undisputed that Congress has not provided student loans with statutory priority under the Bankruptcy Code; (3) the calculations reflect that unsecured creditors will receive under the proposed plan a 5.34% distribution, whereas if no discrimination existed, they would receive

a 7.79% distribution; and (4) Marshall's fresh start likely will not be furthered by the proposed preferential treatment given that a significant amount of her student loan debt will still survive post-bankruptcy. Accordingly, Marshall has not met her burden and the proposed plan may not be confirmed.

6.    *Amanda L. Piersma*

Analyzing the facts of this case, the Court finds the following: (1) the proposed plan does not evenly allocate the mandatory contribution of projected disposable income, and Piersma has not proposed to "square up" the disproportionate contribution, and likely is unable to be able to do so given her below-median status; (2) it is undisputed that Congress has not provided student loans with statutory priority under the Bankruptcy Code; (3) the calculations reflect that unsecured creditors will receive under the proposed plan a 1% distribution, whereas if no discrimination existed, they would receive a 2.63% distribution; and (4) Piersma's fresh start likely will not be furthered by the proposed preferential treatment given that a significant amount of her student loan debt will still survive post-bankruptcy. Accordingly, Piersma has not met her burden and the proposed plan may not be confirmed.

VI.    *Conclusion*

The Court is sympathetic to debtors who face increasingly large and problematic student loan debt. As Judge Berger stated, "[a]t the end of the day, behind the numbers in a consumer bankruptcy case are individuals who are profoundly affected by financial circumstances, as well as their families, employers, and society." *Engen*, 561 B.R. at 550. There is undoubtedly a national student debt problem that continues to raise controversy in Washington, *see* Frotman, *Broken Promises*, 2018 Utah L. Rev. at 811, which policymakers and the higher education community

ultimately must respond to, *id.* at 812. The power of bankruptcy judges to address the same, however, is limited.

Hence, in deciding the matters at hand, the Court has endeavored to balance the aims of the Bankruptcy Code and the interests of all affected parties and to rule in accordance with the directives of Congress. It simply cannot confirm chapter 13 plans that rearrange the priorities Congress has established in chapter 13 cases, as it can only "interpret and enforce the law as Congress has made it." *In re Crawford*, 324 F.3d 539, 676 (7th Cir. 2003).[8] For the above-mentioned reasons, it is the undersigned's opinion that *Bentley* provides the best framework for this Court to address student loan debt in individual consumer cases before it under the present Bankruptcy Code.

The Trustee is directed to submit separate orders consistent with this Memorandum-Decision and, in cases where confirmation has been denied, to provide those Debtors with an opportunity to file an amended plan within 15 days of entry of the order.

Dated: February 4, 2020
        Utica, New York

                        /s/DIANE DAVIS_____
                        Diane Davis
                        United States Bankruptcy Judge

---

[8] The Court notes that its conclusion regarding the need for congressional action finds support in the recently published 2017–2019 Final Report of the ABI Commission on Consumer Bankruptcy. *See* ABI Commission on Consumer Bankruptcy, 2017–2019 Final Report and Recommendations, at pp. 1–15, available at https://consumercommission.abi.org/commission-report ("Summary: While the Commission supports the separate classification of student loan debts, it recommends in the first instance statutory amendments to the Bankruptcy Code [including to 11 U.S.C. § 1322(a)(4) to except priority student loan debt from the repayment-in-full requirement, and to 11 U.S.C. § 1322(b)(10) to allow for the payment of interest].")